UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GEORGE E. WARREN LLC,**<br><br>　　　　　　**Plaintiff,**<br><br>v.<br><br>**COLONIAL PIPELINE COMPANY, and POWDER SPRINGS LOGISTICS, LLC**<br><br>　　　　　　**Defendants.** | Civ. No. 17-1205 (KM)(JBC)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

　　George E. Warren LLC ("GEW") brings this action against Colonial Pipeline Company ("Colonial") and Powder Springs Logistics, LLC ("PSL") under the Carmack Amendment to the Interstate Commerce Act ("ICA") and state tort law. Specifically, GEW seeks a declaratory judgment that Colonial's participation in and facilitation of PSL's in-line blending of butane in Colonial's pipeline violates the Carmack Amendment and further seeks judgment that PSL's actions constitute conversion, tortious interference with prospective economic advantage, and unjust enrichment. Colonial filed a counterclaim seeking a declaratory judgment that GEW incurred no legally cognizable damages from Colonial and PSL's in-line blending.

　　PSL and Colonial separately moved for summary judgment dismissing the action in its entirety. (DE 112, DE 116)[1] GEW entered a cross-motion for summary judgment regarding Colonial's counterclaim and partial summary

---

[1]　Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

　　"DE" = Docket entry number in this case.

　　"Third Am. Compl." = Third Amended Complaint (DE 89)

1

judgment as to defendants' liability, leaving for trial the issue of damages. (DE 126)

Also before the Court are defendants' motion to preclude testimony of plaintiff's expert witness (DE 114) and plaintiff's motion to exclude the expert reports and testimony of defendants' proposed expert witness (DE 130).

For the reasons explained herein, I will grant defendants' motions for summary judgment (DE 112, DE 116), and deny GEW's cross motion (DE 126). Because the matter is dismissed on the merits, the competing motions to exclude the expert witnesses (DE 114, DE 130) need not be considered and are dismissed as moot.

## I. Summary
### A. Statement of facts
#### a. Colonial's Transportation Services

Colonial is a common carrier that owns and operates an interstate pipeline system regulated by the Federal Energy Regulatory Commission ("FERC"). (DE 91 at 1; DE 138-1 at 8) Colonial provides transportation services by transferring refined petroleum products,[2] for a fee, from the pipeline's origin point in the Gulf Coast, in Texas, to its termination point in the New York Harbor, in Linden, New Jersey. (DE 91 ¶1; DE 128-1 at 4; DE 128-2 at 3) At various points between those locations, shippers may upload their petroleum product to, or receive delivery of their product from, the pipeline. (DE 128-2 at 2;(DE 91 at 14)  The rates, terms, and conditions for the transportation services are specified in the Tariffs that Colonial files with FERC.[3] (DE 128-1 at 3; DE 117-3 at 1-27; DE 128-2 at 3; DE 138-1 at 16)

---

[2] The term "petroleum products" refers to "gasolines and petroleum oil distillates." (DE 128-13 at 5)

[3] The Tariffs include the Colonial Pipeline Company Local, Proportional, and Volume Incentive Pipeline Tariff Applying on Petroleum Products ("Rates Tariff") (DE 117-3 at 1-9) and the Colonial Pipeline Company Rules and Regulations Tariff Governing the Transportation of Petroleum Products ("Rules and Regulations Tariff") (DE 117-3 at 10-27).

GEW is a shipper that has tendered gasoline products to Colonial for shipment on its pipeline to destination points in New Jersey, where GEW owns and manages a gasoline blending operation. (DE 91 at 18; DE 117-1 at 8) GEW also purchases gasoline from other shippers on Colonial's pipeline.[4] (DE 128-2 at 34) REDACTED

Colonial transports its products in different "batches." (DE 128-1 at 5) A batch "means a quantity of petroleum product moved through the pipeline as an identifiable unit." (DE 117-3 at 14) There are three types of batches: a segregated batch,[5] a joint batch,[6] and a fungible batch. (DE 117-3 at 17) This dispute arises from Colonial's transportation of gasoline in fungible batches, because that is the method by which GEW ships its product through the pipeline. (DE 128-1 at 5) A fungible batch "is a quantity of petroleum product meeting carrier's [*i.e.,* Colonial's] established specification which may be commingled with other quantities of petroleum product meeting the same specification." (DE 117-3 at 14) Gasoline can be shipped in a fungible batch because it "is a fungible commodity" that is traded "based on its compliance with certain industry-recognized product specifications." (DE 128-1 at 12-13)

Gasoline specifications include, *inter alia*, "characteristics that impact the gasoline's combustion performance, such as the gasoline's octane rating

---

The Rules and Regulations Tariff provides that "[p]etroleum products accepted by [Colonial] shall be subject to and governed by the rates, rules and regulations contained in tariffs issued by [Colonial] and in effect at 12:00 midnight Eastern Standard Time on the date petroleum products are received by carrier." (DE 117-3 at 23)

[4] GEW clarifies that "for gasoline that [it] ships on another shipper's batch, GEW is the consignee of that gasoline while in transit and title transfers to GEW upon GEW's receipt of the gasoline at the end of the pipeline." (DE 128-2 at 34) GEW also notes that the Rules and Regulations Tariff defines consignee as "the party to whom a shipper as ordered the delivery of petroleum product." (DE 117-3 at 15)

[5] Segregated batches contain "a quantity of petroleum product being the product of a single shipper." (DE 117-3 at 14)

[6] A joint batch "is the combination of two or more quantities of petroleum product commingled by the carrier at the request of the participating shippers." (DE 117-3 at 14)

and 'distillation' value, and its environmental impact, such as its volatility," which is "measured in terms of its Reid Vapor Pressure, or 'RVP.'" (DE 128-1 at 13) Colonial's Tariff specifications "is defined by compliance with dozens of product characteristics, typically set as a range between a minimum or a maximum level, rather than a specific number." (DE 128-1 at 6-7) Colonial has the right to reject gasoline for shipment if it does not meet the appropriate specifications. (DE 117-3 at 15)

With respect to product transported in fungible batches, the Rules and Regulations Tariff explain that it is "inherent . . . that interface mixtures will occur between batches." (DE 117-3 at 18) And,

> carrier shall not be liable for variation in gravity or quality of petroleum products occurring while in its custody, resulting from any cause other than the negligence of the carrier, and carrier is under no obligation to deliver the identical petroleum products received and may deliver petroleum products of substantially the same specifications.

(DE 117-3 at 18) In transporting gasoline, Colonial "takes a number of barrels from the fungible batch equal to what the shipper uploaded, and directs them to the destination point specified by shipper." (DE 128-2 at 8; DE 128-2 at 10) Therefore, "[a] shipper of a product placed in a fungible batch does not receive back the exact molecules of product at the destination point that were placed into the pipeline at the point of origin." (DE 128-2 at 11) Instead, the shipper will receive the same volume of on-specification product that it uploaded into the pipeline. (DE 128-2 at 12; DE 117-3 at 18)

### b. Gasoline Blending

As explained, gasoline is fungible. It consists of "a mixture of numerous different hydrocarbons that can be blended in many different combinations in order to meet the specifications." (DE 128-2 at 13) Gasoline blending is the process of adding different gasoline constituents – called blendstocks – with a grade of gasoline to create additional volumes of gasoline that still comply with the specifications. (DE 128-1 at 13) Because certain constituents, like butane

4

and naphtha, cost less than gasoline, blending is a way to maximize volume of gasoline or lower costs. (DE 128-4 at 218-19) The amount of blendstock that can be added to gasoline while staying within the specifications depends on the amount of "blend margin" or "giveaway" in the product. (DE 128-2 at 15)

GEW engages in gasoline blending at its Linden refinery. (DE 128-4 at 154) GEW generates profit by blending less expensive components – like butane and naphtha – into more expensive gasoline and sells the blend at market gasoline prices. (DE 128-2 at 17-18)

### c. Colonial's Joint Venture With PSL

In December 2014, Colonial, through a subsidiary, entered into a joint venture with a subsidiary of Magellan Midstream Partners L.P. ("Magellan") to create PSL. (DE 128-1 at 24-25) Colonial and Magellan, through their subsidiaries, established a facility near Atlanta, Georgia for PSL to inject butane into product flowing through Colonial's pipeline. (DE 128-1 at 25)) That process of injecting butane, or other blendstock, into petroleum product moving through a pipeline is known as in-line blending.

On May 31, 2016, FERC accepted a Tariff modification that provided for consistent treatment of product generated on the pipeline "as the result of non-jurisdictional blending" (*i.e.*, in-line blending) and product uploaded to the pipeline by shippers. *Colonial Pipeline Co.*, 155 FERC ¶ 61,214 at P 4-5. The purpose of the changes was to "provide clarity and consistency to the process for charging shippers and calculating history for excess volumes that are generated in-line on the system other than at specified points of origin." *Id.* at P 7. GEW did not lodge any objection to that modification with FERC. *See Colonial Pipeline Co.*, 155 FERC ¶ 61,214.

PSL began its operations on March 27, 2017. (DE 128-2 at 42) PSL's in-line blending increases the volume of product in the fungible batches on the pipeline, and PSL sells that additional volume to other shippers on the pipeline for a profit. (DE 128-2 at 42-43) GEW knowingly continued to use Colonial's transportation services after PSL began its in-line blending. (DE 128-2 at 43)

5

Defendants contend, and GEW does not dispute, that GEW consistently received on-specification gasoline from Colonial that complied with the relevant Tariffs. (DE 128-1 at 11) However, GEW submits that, as a result of PSL's in-line blending, it has consistently received gasoline products with limited blend margin, and that as a result, it has less leeway to engage in further blending downstream. (DE 128-1 at 11) GEW concedes that it did not contract with Colonial for delivery of gasoline product with a certain blend margin. (DE 128-2 at 32) Nevertheless, GEW maintains that Colonial was not permitted to reduce the blend margin in the gasoline products traveling through its pipeline. (DE 128-2 at 32)

### B. Procedural History

GEW initiated this action on February 21, 2017. (DE 1) Following Colonial's successful motion to dismiss one count of GEW's initial complaint (DE 5; DE 20), GEW filed an Amended Complaint (DE 37), a Second Amended Complaint (DE 85), and finally a Third Amended Complaint (89). In its final form, the Complaint alleged that GEW is "doubly harmed" by defendants' in-line blending:

> (1) GEW receives materially altered and diluted product, which severely limits GEW's ability to add its own blendstocks and profitably sell that blended product as GEW had been doing for 20 years before Defendants began their in-line blending, and (2) GEW is being denied the valuable blended product created by Defendants using GEW's product as well as the profits Defendants earn from selling that blended product.

(Third Am. Compl. ¶7)

In Count I, GEW seeks a declaratory judgment, damages, and disgorgement against Colonial for its "participation in and facilitation of [PSL's] injection of butane into the Colonial Pipeline" which "results in actual injury and loss to GEW's product, in violation of the Carmack Amendment," 49 U.S.C. § 20(11)(a). (Third Am. Compl. ¶42) GEW seeks the profits it would have made had it "been able to continue its own post-transport blending operation as it

6

had prior to Defendants' material alteration and dilution of product through in-line butane injection as well as disgorgement of any illicit profits that Colonial has earned from its unlawful activities." (Third Am. Compl. ¶44)

In Count II, GEW asserts a claim for conversion against PSL, alleging that, "through its in-line butane injection facility, [PSL] is knowingly depriving GEW of its property without GEW's consent and is unlawfully altering and taking GEW's property for [PSL's] own use and profit." (Third Am. Compl. ¶49) GEW seeks "the profits GEW would have made had GEW been able to continue its own post-transport blending unaffected by [PSL's] in-line butane injection as well as disgorgement of the illicit profits that [PSL] has earned from unlawfully converting GEW's product." (Third Am. Compl. ¶50)

In Count III, GEW asserts a claim for unjust enrichment against PSL, seeking "to recover in equity profits held by [PSL] that belong to GEW in equity and good conscience." (Third Am. Compl. ¶53)

Finally, in Count IV, GEW asserts against PSL a claim for tortious interference with its prospective economic advantage. GEW alleges that PSL takes "improper advantage of Colonial's control over the product in the Colonial Pipeline and intentionally interferes with GEW's prospective economic advantage by deliberately altering and misappropriating that product to generate and sell blended product that GEW could otherwise blend and sell for a profit." (Third Am. Compl. ¶65) GEW seeks "the profits GEW would have made had GEW been able to continue its own post-transport blending unaffected by [PSL's] in-line butane injection as well as disgorgement of the illicit profits that [PSL] has earned from its tortious interference." (Third Am. Compl. ¶68)

Colonial filed a counterclaim for declaratory judgment that GEW incurred no legally cognizable damages as a result of defendants' joint venture. (DE 91 at 20)

Thereafter, PSL filed a motion for summary judgment as to all of GEW's claims (DE 113 at 10) and Colonial filed a motion for summary judgment requesting the Court to hold that (1) Colonial is entitled to judgment as a

matter of law on its counterclaim and (2) GEW's Carmack Amendment claim is barred by the filed rate doctrine and is otherwise deficient as a matter of law (DE 117 at 8). GEW moved for summary judgment on Colonial's counterclaim and partial summary judgment as to defendants' liability. (DE 128 at 13)

## II. Discussion

### a. Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### b. The Filed Rate Doctrine

The filed rate doctrine bars "an action against a carrier that would invalidate, alter or add to the terms of [a] filed tariff." *Evans v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000) The rights defined by the tariff "cannot be varied or enlarged by either contract or tort of the carrier." *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 416-17 (1986) (quoting *Keogh v.*

*Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922)) Further, "they are not affected by the tort of a third party." *Id.*

The filed rate doctrine associated with the ICA tariff provisions has a venerable history. *Am. Tel. & Tel. Co. v. Cent. Office Tel. Inc.*, 524 U.S. 214, 222 (1998). It provides that, under the ICA, "the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext." *Louisville & N.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915). While the doctrine "is undeniably strict" and, in some cases, "may work hardship," it nevertheless "embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination." *Id.*; *Cent. Office Tel., Inc.*, 524 U.S. at 223 ("Regardless of the carrier's motive – whether it seeks to benefit or harm a particular customer – the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services.") Despite its name, the doctrine has also been applied where a claim does not involve "rates or ratesetting, but rather involves the provisioning of services and billing." *Cent. Office Tel., Inc.*, 524 U.S. at 223. That is because rates "do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa." *Id.*

As explained by the U.S. Court of Appeals for the Third Circuit and other Circuit courts, the filed rate doctrine

> advance[s] two "companion principles": (1) "preventing carriers from engaging in price discrimination as between ratepayers," and (2) "preserving the exclusive role of . . . agencies in approving rates . . . by keeping courts out of the rate-making process," a function that "regulatory agencies are more competent to perform."

*McCray v. Fid. Nat'l Title Ins. Co.*, 682 F.3d 229, 241-42 (3d Cir. 2012) (second and third alterations in original) (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46, 59 (2d Cir. 1998)). The first principle is the "nondiscrimination strand" of the doctrine; it recognizes that, in the doctrine's absence, "victorious plaintiffs would wind up paying less than non-suing ratepayers." *Id.* at 242 (quoting

10

*Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir. 1994)). The second principle is the "nonjusticiability strand," which recognizes that "(1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set . . . rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." *Id.* (alteration in original) (quoting *Sun city Taxpayers' Assoc. v. Citizens Utils. Co.*, 45 F.3d 58, 62 (2d Cir. 1995))

"Application of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results." *Marcus*, 138 F.3d at 58. The applicability of the doctrine also does not depend on the nature of the plaintiff's cause of action (e.g., antitrust damages, common law fraud, or breach of contract). *Id.* Instead, "the doctrine is applied strictly to prevent a plaintiff from bringing a cause of action even in the face of apparent inequities whenever either the nondiscrimination strand or the nonjusticiability strand underlying the doctrine is implicated by the cause of action the plaintiff seeks to pursue." *Id.* (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 489 (1992) (concluding "that the underlying conduct does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations.")); *In re New Jersey Title Ins. Litig.*, 683 F.3d 451, 459 (3d Cir. 2012) (quoting *Marcus* and noting that the doctrine is applied whenever *either* strand is implicated).

Defendants contend that the filed rate doctrine bars all of GEW's claims. (DE 113 at 20); (DE 1117 at 22). They submit that if GEW were granted the relief it seeks, GEW's rights under the FERC-approved Tariff would be impermissibly enlarged. (DE 113 at 20); (DE 117 at 24) I agree.

GEW's claims against defendants are premised on the reduction of blend margin that occurs as a result of PSL's in-line blending. However, it is undisputed that Colonial's Tariff does not guarantee a certain blend margin in

the gasoline that moves through the pipeline. (DE 128-2 at 32) Under the Tariff, GEW has only the right to receive the same volume and grade of on-specification gasoline that it ships in pipeline. (DE 128-2 at 15) Defendants contend, and GEW does not dispute, that GEW consistently received on-specification gasoline from Colonial that complied with the relevant Tariffs. (DE 128-1 at 11) However, GEW submits that, as a result of PSL's in-line blending, the product has a limited blend margin that reduces GEW's ability to engage in further blending. (DE 128-1 at 11) The receipt of gasoline within a certain blend margin is not specified in the Tariff. (DE 128-2 at 32) Therefore, to recognize that GEW has a right to receive its gasoline with a sufficiently high blend margin to continue its downstream blending would be to recognize a right that does not exist in the FERC-approved Tariff. More importantly, compensating GEW for receiving gasoline with a reduced blend margin would violate the nondiscrimination strand of the filed rate doctrine, because similarly situated shippers who did not sue would be paying different rates for that same service. *See Cent. Office Tel., Inc.*, 524 U.S. at 223.

      GEW contends that the filed rate doctrine does not apply to its claims because defendants' in-line blending constitutes "non-jurisdictional activity" that is "unregulated by FERC and thus not authorized by the Tariff." (DE 128 at 40) However, the nature of a defendant's conduct – here non-jurisdictional blending – does not control the application of the filed rate doctrine. *Marcus*, 138 F.3d at 58. Rather, the doctrine is strictly applied if either of its strands is implicated. *New Jersey Title Ins. Litig.*, 683 F.3d at 459. Here, as explained, GEW's claims violate the nondiscrimination principle. That is sufficient to require that the filed rate doctrine be applied to bar this action. *See Marcus*, 138 F.3d at 58.

      GEW also contends that the doctrine should not apply because GEW "does not seek to 'alter the terms and conditions of a tariff' or seek to enforce, contradict or alter the rates set by the Tariff." (DE 128 at 40) Rather, GEW "seeks relief for Defendants' theft of the blend margin in GEW's gasoline through unauthorized and non-FERC regulated in-line blending." (DE 128 at

40) I find that argument unavailing for two reasons. First, as stated, the application of the doctrine does not depend on the culpability of the defendant's conduct and may apply despite the creation of inequities (which must be addressed, if anywhere, before FERC). *See Marcus*, 138 F.3d at 58. Second, GEW is seeking to alter the terms of the Tariff: it is seeking a supplemental entitlement to a blend margin, one that enlarges its rights under the Tariff.[7]

Perhaps intending to argue in the alternative, GEW then contends that it *does* seek to enforce its rights under the Tariff, because the Tariff prohibits in-line blending. (DE 128 at 43) As proof, GEW points to Item 30(a) in the Rules and Regulations Tariff which provides as follows:

> It is inherent in the operations of a product pipeline that interface mixtures will occur between batches. Therefore, carrier shall not be liable for variation in gravity or quality of petroleum products occurring while in its custody, resulting from any cause other than the negligence of the carrier, and the carrier is under no obligation to deliver the identical petroleum products received and may deliver petroleum products of substantially the same specifications.

(DE 117-3 at 18) GEW submits that "Defendants' injection of butane has nothing to do with the 'inherent' nature of contamination or alteration

---

[7] For this reason, GEW's reliance on *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 764-65 (3d Cir. 2009) in arguing that the filed rate doctrine does not apply is unsuccessful. There, plaintiff homeowners brought suit to recover treble damages pursuant to the Real Estate Settlement Procedures Act, alleging that their private mortgage insurance premiums were channeled into an unlawful kickback scheme operated by their mortgage lender. *Id.* at 755. The Third Circuit agreed with the plaintiffs that the filed rate doctrine was inapplicable because (1) "they challenge[d] the payment of kickback, not the rates they paid" and (2) "they challenge[d] only the commission of conduct proscribed by statute, such that the existence of a filed rate, or pecuniary harm, is irrelevant." *Id.* at 764. Here, GEW is alleging pecuniary harm. More importantly, GEW challenges the *service* it received from Colonial: shipment of gasoline that, despite being on-specification, was subject to in-line blending. As the Supreme Court has recognized, it is axiomatic that a "claim for excessive rates can be couched as a claim for inadequate services and vice versa." *Cent. Office Tel., Inc.*, 524 U.S. at 223. This claim implicates the services – and rates for those services – that GEW is entitled to receive. Therefore, *Alston* is not analogous.

13

occurring as a result of the natural inter-mixed shipment" and that Defendants are "not merely 'negligently' altering the gasoline's quality" but are "***intentionally*** altering it for their own benefit." (DE 128 at 45)

First, GEW ignores the structure of the quoted sentence from Item 30(a), which consists of two clauses separated by a comma. That sentence of Item 30(a), as I read it, says not one thing but two:

> (1) that "the carrier shall not be liable for variation in gravity or quality of petroleum products occurring while in its custody, resulting from any cause other than the negligence of the carrier, and"
>
> (2) that "the carrier is under no obligation to deliver the identical petroleum products received and may deliver petroleum products of substantially the same specifications."

(DE 117-3 at 18) Clause (2), which does not invoke negligence or intent, is most pertinent here. Blend margin is not contemplated in any specification and GEW admits that it has received on-specification gasoline. Thus, Item 30(a) does not support GEW's argument that the Tariff prohibits in-line blending and that the gasoline GEW received did not comply with the Tariff. Under Item 30(a), Colonial is required only to deliver products "of substantially the same specifications." (DE 117 at 18)

That reading of Item 30(a) is supported by *Colonial Pipeline Co.*, 162 FERC ¶ 61,158 (the "*Biodiesel Blending Order*" case), in which FERC interpreted language identical to that in the Rules and Regulations Tariff applicable in this case. The *Biodiesel Blending Order* case merits some extended discussion.

The *Biodiesel Blending Order* case addressed Colonial's "June 23, 2017 tariff filing proposing modification to product specifications for its Greensboro, North Carolina local delivery lines to permit the blending of up to five percent biodiesel into Ultra Low Sulfur Diesel (USLD)." 162 FERC ¶ 61,158 at P 1. There, Colonial had sought "several modifications to its distillate product specifications to support the blending of biodiesel with ULSD on three discrete

14

Colonial line segments in North Carolina." *Id.* at P 2. The blending was to be done by Texon Distributing L.P. ("Texon"), a non-affiliate of Colonial. *Id.* at P 3. Murphy Oil USA, Inc. ("Murphy") filed protests to the proposed Tariff modifications. *Id.* at P 4. Murphy asserted that Colonial chose to treat the in-line blending as non-jurisdictional, and therefore did not "file tariff revisions with explicit rules governing the Texon blending service"; that the arrangement was "made possible by Colonial's forcing shippers that are not customers of Texon to donate a portion of their clear ULSD"; and that Murphy would no longer be able to engage in downstream blending as a result of the arrangement. *Id.* at P 24, 26, 28.

Initially, FERC agreed that the in-line blending arrangement was "non-jurisdictional" and that "any contractual or financial arrangements between Colonial and Texon, or Texon and Colonial's shippers, are irrelevant to the Commission's jurisdiction over the oil pipeline's transportation function." *Id.* at P 50. Nevertheless, FERC found that "the rates, and terms and conditions of services that do actually affect the jurisdictional transportation of ULDS in its blended form with biodiesel, or of ULSD without biodiesel, are appropriately described in the Colonial Tariff." *Id.* at P 51.

FERC next addressed whether the proposed change to the ULSD product specification "to allow for the blending of up to five percent biodiesel" was appropriate. FERC noted that "a pipeline has the ability to determine the services that it offers" and that "oil pipelines do not track molecules of the product. A shipper does not receive the exact molecules that were put into the system *and is only entitled to receive product that is within the pipeline's specifications that are commercially acceptable.*" *Id.* at P 52 (emphasis added). FERC further noted:

> Notwithstanding that Murphy strenuously asserts Colonial's proposal is not just and reasonable and is unduly discriminatory or preferential, the Commission finds that these assertions are all based on Murphy's preference that Colonial not provide the option of blending on its system (or at least continue to provide

15

> transportation service for classic clear ULSD) so that Murphy can blend biodiesel with ULSD after Colonial provides transportation service, which would more effectively support Murphy's particular business model.

*Id.* at P 53. Nevertheless, FERC found "that Colonial's proposal to allow blending through the use of Texon's service does not create an undue preference and is not unduly discriminatory." *Id.* at P 54

The *Biodiesel Blending Order* tariff contained the same language as Item 30(a) quoted *supra*. Applying it, FERC approved of Colonial's modifications that would facilitate in-line blending and further reiterated that a shipper is not entitled to receive designated petrochemical molecules, but "is only entitled to receive product that is within the pipeline's specifications that are commercially acceptable." *Id.* at P 52. That case, then, undermines GEW's position and supports defendants' position that Item 30(a) does not prohibit in-line blending. Under the reasoning of *Biodiesel Blending Order*, GEW is entitled only to receive gasoline with the same specifications that it loaded into the pipeline and is not entitled to gasoline with a certain blend margin.

GEW attempts to distinguish the *Biodiesel Blending Order* case because the tariff at issue there explicitly allowed bio-diesel injection, the shippers involved had a share in the profits, and FERC acknowledged that nothing prevented a shipper from doing additional blending (although FERC also acknowledged that such blending would be expensive and time consuming, *id.* at P 54). (DE 128 at 46 at 47) Here, as explained, the Tariff does not prohibit in-line blending of butane. Further, the FERC opinion does not discuss how the sharing of profits factored into its approval of the tariff modification. *Biodiesel Blending Order* Case, 162 FERC at P 50. Finally, FERC was aware of Murphy's protest that the biodiesel blending arrangement would inhibit its ability to blend downstream, but nevertheless found "that Colonial's proposal to allow blending through the use of Texon's service does not create an undue preference and is not unduly discriminatory." *Id.* at P 54.

16

GEW also argues that "there is no language in the Tariff, Colonial's Shipper Manual, or Colonial's Product Codes and Specifications that permits the in-line injection of blending components such as butane into 'fungible batches' of gasoline." (DE 128 at 46) Instead, as GEW submits, "the Tariff states that a fungible batch is to be comprised of petroleum product, and the Tariff defines 'petroleum product' as 'gasolines and petroleum oil distillates' that '*shall not contain blending components*'" such as butane. (DE 128 at 46) From that definition, GEW contends that "shippers such as GEW cannot upload off-specification product into a fungible pipeline batch – and neither should PSL." (DE 128 at 46). Here, however, GEW ignores a key part of the definition. Item 10(c) provides: "Products tendered for transportation shall not contain blending components, *which are not pure hydrocarbons*, unless carrier has been notified of these components in advance and has agreed to accept such products for shipment." (DE 117-3 at 15) Butane, the blending component here, is a hydrocarbon. (DE 128-1 at 12) Further, Colonial can agree to accept such products with advance notice. (DE 117-3 at 15) Therefore, GEW's argument that 10(c) prohibits in-line blending of butane fails.

Finally, I note that GEW did not move to intervene and protest Colonial's proposed changes to the Tariff regarding the treatment of product generated on the pipeline as a result of the in-line blending. *See Colonial Pipeline Co.*, 155 FERC ¶ 61, 214. While the modification did not explicitly approve of Colonial's in-line blending of butane, the changes put FERC on notice that Colonial was engaging in non-jurisdictional blending that generated "swell" within the pipeline. *Id.* at P 4. GEW could have protested the modification and raised in the proper forum the arguments it now raises before this Court. It failed to do so. Nor was such intervention impossible; Costco Wholesale Corporation, a New Shipper on the pipeline, protested the modification and argued "that Colonial's filing would eliminate any product surplus (swellage) from the earned history of a New Shipper" and asserted "that this will further restrict the ability of New Shippers to become Regular Shippers." *Id.* at P 10. Nothing prevented GEW

17

from lodging a similar protest that it was unfair to permit Colonial to profit from the added swell without sharing those profits with the shippers on the pipeline. Under the filed rate doctrine, absent further action from FERC, GEW is now bound by the rates, terms, and conditions of that and other applicable Tariffs.

I conclude that GEW is incorrect; the filed rate doctrine does apply and does bar its claims. GEW is asking the Court to recognize an entitlement that does not exist in the Tariff: receipt of gasoline with a sufficient blend margin to allow for downstream blending. Therefore, GEW is seeking an enlargement of the Tariff in violation of the doctrine. *See Square D Co.* 476 U.S. at 416-17. Further, GEW asks the Court to compensate it for defendants' alleged "theft" of its blend margin. To do so would give GEW a discounted rate for shipment on Colonial's pipeline that non-suing shippers would not receive, despite receiving the same exact service: delivery of on-specification gasoline that was subjected to in-line blending. Such compensation violates the doctrine's nondiscrimination principle. *McCray*, 682 F.3d at 24.

Because the rights under Colonial's Tariff "are not affected by the tort of a third party," the filed rate doctrine bars not only GEW's claims against Colonial, but also its state-law claims against PSL. *See Square D Co.* 260 U.S. at 163. Without reaching the merits, I note that GEW received what it was entitled to: on-specification gasoline delivered via fungible batches on Colonial's pipeline.

Because the claims are barred by the filed rate doctrine and therefore must be dismissed, I need not address the parties' motions to exclude each other's expert witnesses, which will be dismissed as moot.

### III. Conclusion

For the reasons set forth above, I will grant defendants' motions for summary judgment (DE 112, DE 116), and deny GEW's cross motion for summary judgment (DE 126).

An appropriate order follows.

Dated: November 30, 2020

/s/ Kevin McNulty

_____
**Kevin McNulty
United States District Judge**